**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ALFREDA JONES, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-2356 |
| | § | |
| HOUSTON COMMUNITY COLLEGE | § | |
| SYSTEM, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

The plaintiffs, Alfreda Jones and Kimberly Mason, officers on the campus security force of the Houston Community College ("HCC"), discovered a covert surveillance video camera in the office where, among other things, they changed in and out of their uniforms.  The plaintiffs sued HCC; its Director of Maintenance, Timothy Rychlec; and its Vice-Chancellor of Finance and Administration, Gloria J. Walker.  The plaintiffs also sued three private contractors HCC had retained to install this and other cameras on the campus: Kratos Defense and Security Solutions, Inc.; Kratos Texas, Inc.; and Aramark Management Services Limited Partnership.[1]  The complaint alleged that by participating in covert video surveillance in the office where, among other things, the plaintiffs changed clothes, the defendants are liable under 42 U.S.C. § 1983 for violating the Fourth and Fourteenth Amendment and that the private contractors are liable under state law for invasion of privacy.  The defendants have filed motions to dismiss under Federal Rule of Civil

---

[1]   This opinion refers to the two Kratos defendants collectively as "Kratos."

Procedure 12(b)(6).[2]  Based on the pleadings; the motions, responses, and replies; and the relevant

law, this court denies the motions to dismiss.  The reasons are explained below.

## I.     Background

### A.     The Allegations in the Complaint[3]

Jones, an HCC security officer, and Mason, an HCC campus police officer, carry out part

of their duties in Room 136, the Security and Campus Police Office located in HCC's Coleman

College  for Health Sciences.  (Third Am. Compl. ¶¶ 1, 2, 12).  Officers use Room 136 "in the

normal course of business" to change into and out of their uniforms.  (*Id.* ¶ 16).  Room 136 contains

"a locked drawer for [the] officers' items."  (*Id.*).  Jones and Mason, who are required to wear

uniforms on duty, "frequently changed clothes" in Room 136.  (*Id.* ¶ 15).  Room 136 is 10 feet by

12 feet and the ceiling is approximately 10 feet high.  (*Id.* ¶ 18). The office is not normally open to

the public.  The bottom half of the office door remains closed during normal working hours.  (*Id.*

¶ 17).  When an HCC police or security officer uses Room 136 to change into his or her uniform,

the officer closes the entire office door and locks it.  (*Id.*).  The office remains locked when no one

is there.  (*Id.*).

---

[2]   The defendants filed two sets of motions to dismiss.  First, the defendants filed four motions to dismiss the plaintiffs' first amended complaint.  (*See* Docket Entries No. 6, 8, 10, 15).  After the defendants filed these motions, the plaintiffs filed a motion for leave to file a second amended complaint.  (Docket Entry No. 18).  The plaintiffs withdrew this motion and, at the court's instruction, filed a motion for leave to file a third amended complaint.  (Docket Entry No. 31).  Kratos and Aramark filed motions to dismiss the third amended complaint.  (Docket Entries No. 32, 33).  HCC, Rychlec, and Walker filed a response to the motion for leave to amend, arguing that amendment would be futile because the third amended complaint fails to state claims upon which relief can be granted.  (Docket Entry No. 36).  The court grants the plaintiffs' motion for leave to file a third amended complaint and construes HCC's, Rychlec's, and Walker's response as a motion to dismiss the third amended complaint.  Because the second set of motions to dismiss includes all the arguments made in the first set of motions to dismiss, this court denies as moot the first set of motions to dismiss.

[3]   Because the defendants have moved to dismiss the plaintiffs' complaint under Rule 12(b)(6), this court accepts as true the complaint's factual allegations.  *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2079 (2011).

On August 13, 2008, Jones learned from another officer that HCC had installed "a secret monitoring camera" in Room 136.  (*Id.* ¶ 19).  That officer "fortuitously discovered the existence of the hidden camera" when a Kratos employee "misread a work order and came to remove one of the covert cameras in the a.m. instead of the p.m."  (*Id.*).  Jones told Mason about the covert video camera in Room 136.  (*Id.*).  The camera was located in the air vent or in the light fixture "over the sole desk in the middle of the office."  (*Id.* ¶ 14).  HCC did not tell its officers of the existence of the covert video monitoring camera.  (*Id.* ¶ 13).

The plaintiffs allege that since discovering the covert camera in Room 136, they "have learned that HCC installed many other covert cameras in the building: over the dean's office or in the antechamber to the dean's office, near or over the restroom area of the lab, in the Student Services office, immediately outside the Security Office, in the lobby of the building, and in the library."  (*Id.* ¶ 20).  Security and campus police officers used Room 136 to monitor the video feed from nine surveillance video cameras installed in various places on the campus.  (*Id.* ¶ 12).  The plaintiffs allege that unlike the nine campus surveillance cameras with feed monitored in Room 136, the covert cameras on campus—including the covert camera in Room 136—were installed in such a way "that one could not see them, such as in air vents, behind clocks, and in smoke detectors," and some were "equipped for audio recording."  (*Id.* ¶ 22).  The plaintiffs allege that "the camouflaging inherent" in the covert placement "reveals that the cameras served an unlawful purpose, such as monitoring the private activities of unknowing individuals in areas in which they had a reasonable expectation of privacy."  (*Id.* ¶ 23).  Anyone who knew the IP address of the covert cameras, including Rychlec, could access the video feed remotely.  (*Id.* ¶ 25).  The plaintiffs do not know the number of people who monitored these hidden cameras but allege that at least one person did so.

(*Id.* ¶¶ 26, 27).   In August 2009, Diana Castillo, HCC's Operating Officer, told Jones that Dr. Merisol Stoll had reported seeing "the recordings of the covert cameras." (*Id.* ¶ 26).  The plaintiffs allege that other employees made flirtatious comments to them—such as "Okay I'm watching you, I'm listening to you"—before the plaintiffs discovered the covert cameras and that these comments suggest that other persons accessed the video feed from the covert camera installed in the office they used to change clothes.  (*Id.* ¶ 27).

The plaintiffs allege that the covert cameras were installed in the fall or winter of 2005—"without warrant, without other legal authorization and for private purposes"—and remained in place until at least July 2008.  (*Id*. ¶ 24).  According to the plaintiffs, the covert cameras "were purchased and installed" by Rychlec, HCC's Director of Maintenance, "with [the] participation and direction" of Walker, HCC's Vice-Chancellor of Finance and Administration.  (*Id.* ¶ 28).  When Rychlec filled out the HCC purchase orders for the covert cameras, he took "care to be vague on the description section . . . to conceal the nature of [his and Walker's] activities." (*Id.* ¶ 29).  Rychlec and Walker were allegedly HCC's "final policy makers for formulating and instituting security policy."  The plaintiffs allege that HCC's bylaws and regulations authorized Rychlec and Walker "to make purchases in the dollar amounts represented by the covert cameras." (*Id.* ¶ 28).

When the covert cameras were installed, Aramark had a contract with HCC to provide maintenance services for all the HCC campuses.  (*Id.* ¶ 30).  The plaintiffs allege that Aramark had "a permanent director embedded in the HCC staff with authority to make decision[s] related to security monitoring and other operations." (*Id.*).  Aramark in turn subcontracted with Kratos for its employees to take "over HVAC and security monitoring functions assigned by [the HCC-Aramark contract] to Aramark." (*Id.* ¶ 32).  Kratos also entered into contracts with HCC.  Under these

contracts, "HCC accepted Kratos's proposals for the purchase and installation of various covert cameras in offices and other locations at HCC." (*Id.* ¶ 34). The plaintiffs allege that "Aramark worked in concert with Kratos" to install the covert cameras "through both extracontractual activities and through [the Aramark-Kratos agreement]." (*Id.* ¶ 32). According to the complaint, when installing and maintaining the covert cameras, Kratos employees worked "after hours" and "in disguise." (*Id.* ¶ 33). Aramark and Kratos created a "cover story . . . under which a false reason for their activities would be given in response to anticipated questions by HCC employees such as Plaintiffs." (*Id.*). Aramark's "specific consent" was required for any covert camera that Kratos installed on HCC's campuses. (*Id.* ¶36). The cameras were installed "at the direction of management personnel in Kratos and HCC." (*Id.* ¶ 46).

The plaintiffs allege that numerous emails between Kratos and HCC employees reveal their concerted efforts to conceal the existence of the covert video surveillance cameras. According to the plaintiffs, these emails indicate that: Kratos should not write any tickets for work related to the covert cameras "for obvious reasons"; invoices sent by Kratos to HCC should not reflect that Rychlec knew about the covert cameras; costs associated with removing covert cameras "would be hidden in the general billings for security"; the removal of covert cameras would occur after hours; Kratos would "request a key for after hours work for 'a special project'"; removing the covert cameras would require Kratos employees to cheat on their timesheets; "the falsified time approval and billing practices . . . would result in the loss of the Kratos supervisor's job if he were 'caught'"; and the stress generated by concealing the existence of the covert cameras could cause the Kratos supervisor to suffer a heart attack. (*Id.* ¶ 36).

The complaint asserts two causes of action: (1) 42 U.S.C. § 1983, against all defendants; and (2) state-law invasion of privacy, against Aramark and Kratos. Under § 1983, the plaintiffs allege that the defendants' actions "have allowed an unknown group of individuals to monitor [Jones and Mason] in their most compromised conditions," (*id.* ¶ 44), and that the defendants' covert monitoring violated the plaintiffs' Fourth and Fourteenth Amendment rights under the United States Constitution, (*id.* ¶ 45). The plaintiffs allege that HCC had an official policy to conduct covert video camera surveillance of its employees because Rylech and Walker had final authority at HCC to implement campus security measures and because covert cameras were widely used across the campuses. (*Id.* ¶¶ 38, 42–43). The plaintiffs also allege that Kratos and Aramark conspired and acted in concert with the other defendants to deprive the plaintiffs of their constitutional rights. (*Id.* ¶ 41). Under the state-law cause of action, the plaintiffs allege that Aramark and Kratos "intentionally intruded upon the [plaintiffs'] seclusion" by installing and monitoring the covert video surveillance camera in Room 136 "over a period of at least two and a half years," during which the plaintiffs and other officers routinely used the room to change clothes. (*Id.* ¶ 52).

### B.    The Motions to Dismiss

The defendants filed three Rule 12(b)(6) motions to dismiss the plaintiffs' third amended complaint. In the first two motions—one filed by Kratos (Docket Entry No. 32) and one filed by Aramark (Docket Entry No. 33)—Kratos and Aramark argue that the complaint should be dismissed because: (1) they are immune from liability under the government-contractor defense; (2) the plaintiffs failed to plead facts sufficient to show that Kratos and Aramark acted under color of state law; and (3) the plaintiffs did not have a reasonable expectation of privacy from covert video surveillance in Room 136. The third motion to dismiss (Docket Entry No. 36) was filed by HCC,

Rychlec, and Walker.  HCC argues that the plaintiffs failed to state a claim against it under *Monnell v. Department of Social Services*, 436 U.S. 658 (1978), because the complaint makes only conclusory allegations that HCC had an official policy of covertly monitoring its employees in Room 136.  Rychlec and Walker argue that they are entitled to qualified immunity because the plaintiffs failed to plead sufficient facts to show that they had a reasonable expectation of privacy in Room 136 and because, at the time the cameras were installed, the plaintiffs' constitutional right to be free from covert video surveillance in Room 136 was not clearly established.

Each argument is addressed in detail below.

## II.     The Legal Standard under Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b) (6).  In *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555, (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  *Twombly* abrogated the Supreme Court's prior statement in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *See Twombly*, 550 U.S. at 562–63.  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).  In *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*. The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual

allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555). *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The *Iqbal* Court noted that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 557). The Court concluded that "Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Id.*

To withstand a Rule 12(b)(6) motion, a "complaint must allege 'more than labels and conclusions,'" and "'a formulaic recitation of the elements of a cause of action will not do.'" *Norris v. Hearst Trust*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555); *see also Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "'Rule 8(a)(2) . . . requires a 'showing,' rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.'" *Dark v. Potter*, 293 F. App'x 254, 258 (5th Cir. 2008) (unpublished) (per curiam) (quoting *Twombly*, 550 U.S. at 556

n.3). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. at 555). "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Cuvillier*, 503 F.3d at 401 (quoting *Twombly*, 550 U.S. at 558).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (internal citation omitted)). However, a plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990); *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) ("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous

or futile.'" (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195

F.3d 765, 771 (5th Cir. 1999))).

### III.   The Private Contractors' Motions to Dismiss Based on the Government-Contractor Defense and the Failure to Allege Action under Color of State Law

### A.   The Government-Contractor Defense

Kratos and Aramark argue they are immune from liability under the government-contractor

defense recognized by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500

(1988).  "The government contractor defense, as formulated . . . in *Boyle*, generally immunizes

government contractors from civil liability arising out of the performance of *federal* procurement

contracts."  *Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 797 (5th Cir. 1993) (emphasis

added).  "It is a federal common law doctrine whereby state law is preempted in certain situations

because it presents a 'significant conflict' with identifiable federal interests."  *Id.* (citation omitted).

The defense "shields contractors from tort liability for products manufactured for the Government

in accordance with Government specifications, if the contractor warned the United States about any

hazards known to the contractor but not to the Government."  *Hercules Inc. v. United States*, 516

U.S. 417, 422 (1996).  The defense stems from the discretionary-function exception of the Federal

Tort Claims Act, which shields the government from liability from design defects in military

equipment.  *Boyle*, 487 U.S. at 511–12.  As the Court explained, "[i]t makes little sense to insulate

the Government against financial liability for the judgment that a particular feature of military

equipment is necessary when the Government produces the equipment itself, but not when it

contracts for the production."  *Id.* at 512.  In the absence of the defense, "[t]he financial burden of

judgments against the contractors would ultimately be passed through . . . to the United States itself,

since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs." *Id.* at 511–12.

The government-contractor defense does not apply to state contractors like Kratos and Aramark. *See United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1147 (9th Cir. 2004) ("Neither the Supreme Court nor the Ninth Circuit nor any other court of which we are aware has applied the defense to state contractors."). Acknowledging this point, the defendants ask this court to extend the defense to state contractors. The defendants argue that the Supreme Court's reasoning "extends to the contract for the installation of the security cameras which forms the basis of the Plaintiffs' Complaint" because "Houston Community College, . . . like the federal government, retains sovereign immunity from state law tort liability where it has exercised discretion or made policy level decisions in carrying out its governmental functions." (Docket Entry No. 32, at 3).

Contrary to the defendants' argument, *Boyle*'s reasoning does not support extending the government-contractor defense to state contractors. In *Boyle*, the Court explained that "state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with federal policy and must be displaced." 487 U.S. at 512. Because the defendants are state contractors, laws that may impose liability on them do not conflict with federal policy. Moreover, the plaintiffs have alleged that Kratos and Aramark violated 42 U.S.C. § 1983. The government-contractor defense—a federal common-law doctrine—cannot displace federal statutory law. *Cf. Kasza v. Browner*, 133 F.3d 1159, 1167 (9th Cir. 1998) (recognizing that a federal statute that "speaks directly to the question otherwise answered by federal common law" preempts the common law (internal quotation marks and alterations omitted)).

11

Even if the government-contractor defense applied to Kratos and Aramark, the defendants would not be entitled to dismissal.  The government-contractor defense is an affirmative defense, for which the defendants bear the burden of proof at trial.  *Bailey*, 989 F.2d at 802.  "Although dismissal under rule 12(b)(6) may be appropriate based on a successful affirmative defense, that defense must appear on the face of the complaint."  *EPCO Carbon Dioxide Products, Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006); *see also Hall v. Hodgkins*, 305 F. A'ppx 224, 227–28 (5th Cir. 2008) ("If, based on the facts pleaded and judicially noticed, a successful affirmative defense appears, then dismissal under Rule 12(b)(6) is proper.").  The plaintiffs' complaint does not allege facts that could give rise to the government-contractor defense. The defense requires a contractor to show that: (1) the United States approved reasonably precise specifications for the design or manufacture of a product; (2) the contractor's product conformed to those specifications; and (3) the contractor warned the United States about dangers associated with the use of the product known to the manufacturer but not to the government.  *Boyle*, 487 U.S. at 512.  The plaintiffs have not alleged that the work Kratos and Aramark performed for HCC was required by their HCC contracts.  To the contrary, the plaintiffs have alleged that "[i]n the installation and monitoring of the covert cameras, Aramark worked in concert with Kratos[] through . . . extracontractual activities."  (Third Am. Compl. ¶ 32).

The defendants' motion to dismiss on the basis of the government-contractor defense is denied.

### B.    Action under Color of State Law

Kratos and Aramark argue that the plaintiffs' complaint fails to state a claim against them because it contains no factual allegations showing that they acted under color of state law.  To state

a claim under § 1983, "a plaintiff must allege facts showing that a person, acting under color of state law, deprived the plaintiff of a right, privilege or immunity secured by the United States Constitution or the laws of the United States." *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 686 (5th Cir. 2010). Although "[p]rivate individuals generally are not considered to act under color of law," a private individual "may act under color of law in certain circumstances, such as when [he] is involved in a conspiracy or participates in joint activity with state actors." *Ballard v. Wall*, 413 F.3d 510, 518 (5th Cir. 2005) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52 (1970)); *see also Priester v. Lowndes Cnty.*, 354 F.3d 414, 420 (5th Cir. 2004) ("For a private citizen . . . to be held liable under section 1983, the plaintiff must allege that the citizen conspired with or acted in concert with state actors."); *Keko v. Hingle*, 318 F.3d 639, 642 (5th Cir. 2003) ("As the Supreme Court has held, a private party may be liable for conspiring with state actors to violate civil rights."); *Phillips v. Vandygriff*, 711 F.2d 1217, 1225–26 (5th Cir. 1983) ("It is enough [to establish a conspiracy] that [a private party] is a willful participant in joint activity with the State or its agents."). To plead action under color of state law for a conspiracy theory, "[t]he plaintiff must allege: (1) an agreement between the private and public defendants to commit an illegal act and (2) a deprivation of constitutional rights." *Priester*, 354 F.3d at 420; *see also Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010) (stating that "to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred"). Conspiracy allegations that "are merely conclusory, without reference to specific facts," will not survive a motion to dismiss. *Priester*, 354 F.3d at 420.

The complaint alleged sufficient facts to state a plausible claim that the defendants "participate[d] in joint activity with state actors." *Ballard*, 413 F.3d at 518. Aside from the

conclusory allegations of conspiracy and concerted action, the plaintiffs have alleged the following facts:

- "Aramark was responsible for operations and maintenance on the HCC campuses" and had "a permanent director embedded in the HCC staff with authority to make decision[s] related to security monitoring," (Third Am. Compl. ¶ 30);

- "an Aramark maintenance employee reported to a fellow Aramark employee the locations of the hidden cameras," (*id.* ¶ 31);

- "[i]n the installation and monitoring of the covert cameras, Aramark worked in concert with Kratos, through both extracontractual activities and through a Service Provider Agreement," (*id.* ¶ 32);

- "Kratos employees, with the assistance of Aramark," performed maintenance work on the covert cameras "after hours and/or in disguise," (*id.* ¶ 33);

- "[a] cover story was created by Aramark and Kratos under which a false reason for their activities would be given in response to anticipated questions by HCC employees such as Plaintiffs," (*id.*);

- "Kratos entered into at least two separate written agreements with HCC through Rylech, by which HCC accepted Kratos's proposals for the purchase and installation of various covert cameras in offices and other locations at HCC," (*id.* ¶ 34);

- "the installation of the cameras was made at the direction of management personnel in Kratos and HCC," (*id.* ¶ 46);

- Kratos and HCC exchanged emails in which they discussed concealing the costs related to the covert cameras "in the general billings for security," not mentioning "defendant Rylech's

knowledge" in Kratos invoices, "cheating on the Kratos time sheets approved by the Kratos supervisor," and the probability that the Kratos supervisor would lose his job if "the falsified time approval and billing practices" were discovered, (*id.* ¶ 36);

- "by contract between Aramark and Kratos, Aramark's 'specific consent' was required for such activities as Kratos's installation of a covert camera system on a HCC campus," (*id.*).

The allegations that Kratos and Aramark created a "cover story" for HCC employees who witnessed them perform work on the covert cameras, that Kratos played a role in the decision to install the covert cameras, and that Kratos helped HCC officials conceal the existence of the cameras by falsifying its employees' time records, all support an inference that Aramark and Kratos actively participated with HCC officials in the alleged violations of the plaintiffs' constitutional rights. The defendants' motion to dismiss based on insufficient allegations of action under the color of state law is denied.[4]

## IV.   HCC's Motion to Dismiss for Failure to Allege an Official Policy or Custom

To prevail on a § 1983 claim against HCC, the plaintiffs must show that an official policy or custom caused a deprivation of their constitutional rights. "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, . . . a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."[5]   *Monell*, 436 U.S. at 691. The "official policy" requirement

---

[4]   Aramark and Kratos also argue that the plaintiffs failed to allege a constitutional violation because they did not have a reasonable expectation of privacy in Room 136. (Docket Entry No. 32, at 8). This argument is addressed in Part V of the opinion, which addresses Rychlec's and Walker's argument that they are entitled to qualified immunity.

[5]   Although *Monell* refers to municipalities, *Monell* applies generally to suits against local government entities, including public colleges. *See Goss v. San Jacinto Junior College*, 588 F.2d 96, 98 (5th Cir. 1979).

distinguishes "acts of the *municipality* from acts of *employees* of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). A municipality "may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy." *Id.* at 480. Action by an official with "final authority to establish municipal policy with respect to the action ordered" also constitutes official policy. *Id.* at 481; *see also McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 784 (1997) ("[Official] policies may be set by the government's lawmakers, 'or by those whose edicts or acts may fairly be said to represent official policy.'" (quoting *Monell*, 436 U.S. at 694)); *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008) ("It is well-established that a single unconstitutional action by a municipal actor may give rise to municipal liability if that actor is a final policymaker.").

HCC argues that the plaintiffs failed to plead sufficient facts to show that it had an official policy of monitoring employees in Room 136 through covert video surveillance. Decisions by college officials with final authority over the placement of covert cameras are the relevant official policy for the purpose of § 1983. *Pembaur*, 475 U.S. at 481–84. The plaintiffs alleged that the covert cameras were installed at Rychlec's and Walker's direction, and that Rychlec and Walker were the final decisionmakers for formulating and implementing campus security measures. HCC contends that these allegations are conclusory. But the plaintiffs alleged that Rychlec was Director of Maintenance and Walker was the Vice-Chancellor of Finance and Administration; that Rychlec and Walker were authorized to purchase surveillance equipment by HCC's bylaws and regulations;

16

and that Rychlec—acting on HCC's behalf—entered into at least two contracts with Kratos for the purchase of the covert cameras.  These factual allegations are sufficient to state a plausible claim that Rychlec and Walker were responsible for formulating and implementing campus security measures and that their decision to install the covert camera in Room 136 was, because of their authority, HCC's official policy.  *See McGreal v. Ostrov*, 368 F.3d 657, 685 (7th Cir. 2004) ("[A] single act or decision of a final policymaker can establish municipal policy." (citation omitted)).

This ruling, of course, does not preclude HCC from moving for summary judgment based on the same or similar arguments, with an expanded record.  Whether an official had final policymaking authority is a question of state law "to be resolved by the trial judge *before* the case is submitted to the jury." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).  Discovery may reveal that Rychlec and Walker did not have any final policymaking authority, had final policymaking authority in matters other than campus security, or had some discretion to implement certain security measures but were not responsible for establishing HCC's final campus security policy.  Such evidence would significantly impact HCC's § 1983 liability.  As the Supreme Court has explained, "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.  The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Pembaur*, 475 U.S. 481–83 (internal citation omitted).  Moreover, local governments "often spread policymaking authority among various officers and official bodies," which means that "particular officers may have authority to establish binding . . . policy respecting particular matters." *Id.* at 483. Liability attaches "where—and only where—a deliberate choice to follow a course of action is made

from among various alternatives by the official . . . responsible for establishing final policy *with respect to the subject matter in question*." *Id.* (emphasis added).  But based only on the complaint, the plaintiffs have alleged sufficient facts to "nudge[] their claim[]" that Rychlec and Walker were final decision-makers for HCC's campus security policy "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  HCC's motion to dismiss is denied.[6]

## V.   The HCC Officials' Motion to Dismiss Based on Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011).  A right is "clearly established" if, at the time of the alleged violation, its "contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citation omitted).  When holding that conduct violated clearly established law, a

---

[6]   A plaintiff may also establish municipal liability under § 1983 by demonstrating the existence of a "custom." *See Monell*, 436 U.S. at 690–91 ("[A]lthough the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."); *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989) (stating that a municipality may be liable under § 1983 for constitutional violations caused by "a persistent, widespread practice of city officials or employees that, although not authorized by officially adopted policy, is so common and well settled as to constitute a custom that fairly represents official municipal policy").  "Unlike a 'policy', which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up.  Thus, the liability of the municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance of or acquiescence in it." *Britton v. Maloney*, 901 F. Supp. 444, 450 (D. Mass. 1995).  Because the plaintiffs have stated a plausible claim that Rychlec and Walker had final authority for making campus security decisions, there is no present need to address whether the complaint states a plausible claim that HCC had a custom of covertly monitoring its employees.

18

court "must be able to point to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, --- F.3d ----, 2011 WL 4470233, at *7 (5th Cir. Sept. 27, 2011) (en banc) (quoting *al-Kidd*, 131 S. Ct. at 2084). "Although the Supreme Court has repeatedly admonished courts not to define clearly established law at a high level of generality, this does not mean that 'a case directly on point' is required." *Id.* (quoting *al-Kidd*, 131 S. Ct. at 2083). The Court has explained that an official "can still be on notice that [his] conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "[T]he salient question . . . is whether the state of the law [at the time of the alleged violation] gave [that official] fair warning that [his conduct] was unconstitutional." *Id.*; *see also Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S. Ct. 2633, 2643 (2009).

Rychlec and Walker argue that they are entitled to qualified immunity both because the plaintiffs have failed to plead a constitutional violation and, assuming that the plaintiffs satisfy this requirement, because the plaintiffs' right to be free from covert video surveillance was not clearly established at the time the covert camera was installed and used. The defendants contend that the plaintiffs failed to plead a constitutional violation for two reasons. First, the defendants argue that the complaint contains insufficient factual allegations to show that the plaintiffs had a reasonable expectation of privacy in Room 136.[7] (Docket Entry No. 36, at 10–11). Second, the defendants argue that the plaintiffs' "only credible allegations state that Rychlec and Walker made a

---

[7]   As discussed below, a Fourth Amendment search occurs when the government infringes on a person's reasonable expectation of privacy. To prevail on their Fourth Amendment claim, the plaintiffs must prove both that a search occurred and that the search was unreasonable. The defendants argue that the complaint fails to sufficiently allege a Fourth Amendment search; they do not argue that the complaint fails to sufficiently allege that the search was unreasonable.

Constitutional violation possible—not that they caused one." (*Id.*, at 9). According to the defendants, "[t]he mere procurement, and even installation, of a hidden camera, without more, is not a Constitutional violation." (*Id.*). The defendants argue that the plaintiffs' Fourth Amendment rights were not clearly established at the time of the alleged violation, both because the Fifth Circuit had not decided a similar case and because case law from other circuits was "unclear regarding whether there could be a reasonable expectation of privacy in the Security Office in this case." (*Id.*, at 12). Each argument is addressed below.

### A.      Whether the Plaintiffs Have Alleged a Violation of a Constitutional Right

The plaintiffs alleged that the defendants violated their Fourth Amendment rights to be free from unreasonable searches by covertly monitoring their private actions in Room 136. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government, without regard to whether the government actor is investigating crime or performing another function" and "applies as well when the Government acts in its capacity as an employer." *City of Ontario, Cal. v. Quon*, 130 S. Ct. 2619, 2627 (2010) (citation and internal quotations marks omitted). "A 'search' for purposes of the Fourth Amendment occurs when a reasonable expectation of privacy is infringed." *Segura v. United States*, 468 U.S. 796, 820 (1986). A reasonable expectation of privacy exists when: (1) a person "manifest[s] a subjective expectation of privacy in the object of the challenged search"; and (2) "society [is] willing to recognize that expectation as reasonable." *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). "Although as a general matter,

20

warrantless searches 'are *per se* unreasonable under the Fourth Amendment,' there are 'a few specifically established and well-delineated exceptions' to that general rule." *Quon*, 130 S. Ct. at 2630 (quoting *Katz*, 389 U.S. at 357).  One exception applies to workplace searches conducted by government employees.  "[W]hen conducted for a noninvestigatory, work-related purpose or for the investigation of work-related misconduct, a government employer's warrantless search is reasonable if it is justified at its inception and if the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the circumstances giving rise to the search." *Id.* (internal quotations marks and alterations omitted).

The Supreme Court has held that employees may have a reasonable expectation of privacy in their business offices.  "What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile." *Hoffa v. United States*, 385 U.S. 293, 301 (1966).  "The Fourth Amendment's protection of offices and commercial buildings, in which there may be legitimate expectations of privacy, is . . . based upon societal expectations that have deep roots in the history of the Amendment." *Oliver v. United States*, 466 U.S. 170, 178 n.8 (1984).  In *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968), the Court held that a union employee had a reasonable expectation of privacy in his office that gave him standing to challenge a warrantless search even though he shared that office with other union employees.  The Court explained:

> It has long been settled that one has standing to object to a search of his office, as well as of his home . . . . [I]t seems clear that if DeForte had occupied a 'private' office in the union headquarters, and union records had been seized from a desk or a filing cabinet in that office, he would have had standing . . . . In such a 'private' office, DeForte would have been entitled to expect that he would not be disturbed except by personal or business invitees, and that records would not be taken except with his permission or that of his union superiors.  It

21

seems to us that the situation was not fundamentally changed because DeForte shared an office with other union officers. DeForte still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups. This expectation was inevitably defeated by the entrance of state officials, their conduct of a general search, and their removal of records which were in DeForte's custody.

*Id.*

The Supreme Court has also held that public employees may have a reasonable expectation of privacy in their offices against intrusions by the government-employer even when no criminal investigation is underway. In *O'Connor v. Ortega*, 480 U.S. 709 (1987), a physician employed at a state hospital alleged that hospital officials investigating workplace misconduct had violated his Fourth Amendment rights by searching his office and seizing personal items from his desk and filing cabinet. The Court rejected "the contention . . . that public employees can never have a reasonable expectation of privacy in their place of work" because "[i]ndividuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer." *Id.* at 717. But as a plurality of the Court observed,

> [t]he operational realities of the workplace . . . may make *some* employees' expectations of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official. Public employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures, or by legitimate regulation . . . . The employee's expectation of privacy must be assessed in the context of the employment relation. An office is seldom a private enclave free from entry by supervisors, other employees, and business and personal invitees. Instead, in many cases offices are continually entered by fellow employees and other visitors during the workday for conferences, consultations, and other work-related visits. Simply put, it is the nature of government offices that others—such as fellow employees, supervisors, consensual visitors, and the general public—may have frequent

access to an individual's office.  We agree with Justice Scalia that "[c]onstitutional protection against *unreasonable* searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer,". . . but some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable . . . . Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis.

*Id.* at 717–18.[8]

To prevail on their Fourth Amendment claim, the plaintiffs must allege sufficient facts to show that, based on the "operational realities of the workplace," they had a reasonable expectation of privacy in Room 136.  *See O'Connor*, 480 U.S. at 715.  Contrary to the defendants' argument, the plaintiffs' complaint satisfies this requirement.  The plaintiffs have alleged that they did not expect to be secretly videotaped in Room 136.  They alleged that they routinely used Room 136 to change clothes and that they locked the door when they did so.  Allegations of intimate activities and corresponding efforts to maintain privacy are sufficient to show a subjective expectation of privacy. *See Bond v. United States*, 529 U.S. 334, 338 (2000) (holding that an individual has a subjective expectation of privacy when he takes efforts "to preserve something as private" (citation and alteration omitted)); *Carter v. Cnty. of Los Angeles*, 770 F. Supp. 2d 1042, 1049 (C.D. Cal. 2011) ("Here, Plaintiffs undeniably manifested a belief that their actions were executed in private: they performed various grooming, cleaning, and changing acts reserved for private places."); *Trujillo v.*

---

[8]    The concurring and dissenting justices advocated more permissive approaches for establishing reasonable expectations of privacy in government offices.  Writing for four justices, Justice Blackmun stated that he "would go along with the plurality's observation that, in certain situations, the 'operational realities' of the workplace may remove some expectations of privacy on the part of the employee," but was "disturbed by the plurality's suggestion . . . that routine entries by visitors might completely remove this expectation."  *O'Connor*, 480 U.S. at 737 (Blackmun, J., dissenting.).  Justice Scalia would have held "that the offices of government employees . . . are covered by the Fourth Amendment protections as a general matter."  *Id.* at 731 (Scalia, J., concurring).  The concurring and dissenting justices—a majority of the Court—found that the plaintiff physician had a reasonable expectation of privacy in his hospital office.  *Id.* at 718.

*City of Ontario*, 428 F. Supp. 2d 1094, 1102 (C.D. Cal. 2006) ("Here, Plaintiffs have presented sufficient evidence that they performed activities such as changing clothes and showering in the locker room and had a subjective expectation of privacy to be free from covert video surveillance.").

The plaintiffs have also alleged sufficient facts to show that their expectation of privacy was objectively reasonable.  Although there is no "talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable," *O'Connor*, 480 U.S. at 715, courts may consider "the uses to which the individual has put a location . . . and our societal understanding that certain areas deserve the most scrupulous protection from government invasion," *Oliver*, 466 U.S. at 178.  The plaintiffs have alleged that security and police officers routinely used Room 136 to change clothes, that the office contained a locked drawer for the officers' items, that the public did not normally have access to the office, and that the entire office door was shut and locked when officers changed clothes and when no officer was in the room.  It is objectively reasonable to expect privacy in an office when it is routinely used as a locker room.  That other campus security officers also had access to the office does not defeat the plaintiffs' expectation of privacy in Room 136.  "Privacy does not require solitude.  As *O'Connor* recognized, even 'private' business offices are often subject to the legitimate visits of coworkers, supervisors, and the public, without defeating the expectation of privacy unless the office is 'so open to fellow employees or the public that no expectation of privacy is reasonable.'"  *United States v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991) (quoting *O'Connor*, 480 U.S. at 717–18).  The plaintiffs alleged the Room 136 was not open to the public and that the only employees who had regular access to it were on-duty campus security and police officers.

The nature of the intrusion in this case—surreptitious video surveillance—further supports the plaintiffs' allegations.  A person may have a legitimate expectation of privacy with respect to a particular type of intrusion, even if not to others.  *See United States v. Nerber*, 222 F.3d 597, 601 (9th Cir. 2000). ("[N]umerous Supreme Court and appellate decisions . . . suggest [that] the legitimacy of a citizen's expectation of privacy in a particular place may be affected by the nature of the intrusion that occurs."); *O'Connor*, 480 U.S. at 738 (Blackmun, J., dissenting) ("[A]lthough an employee might well have no reasonable expectation of privacy with respect to an occasional visit by a fellow employee, he would have such an expectation as to an afterhours search of his locked office by an investigative team seeking materials to be used against him at a termination proceeding.").  In *Katz*, "a person in a glass phone booth had a legitimate expectation that his phone conversation would not be intercepted, even though he could not legitimately expect that his activities within the booth would not be observed."  *Nerber*, 222 F.3d at 601.  Here, accepting the complaint's allegations as true, the plaintiffs had a legitimate expectation that they would not be secretly videotaped in Room 136, even though they could not legitimately expect that no other on-duty campus security officer would enter the room.  *See, e.g., Bernhard v. City of Ontario*, 270 F. App'x 518, 519 (9th Cir. 2008) (unpublished) ("[R]easonable persons, including police officers, do not expect to be secretly videotaped by other police officers while changing clothes in their workplace locker rooms."); *Nerber*, 222 F.3d at 604 ("Even if one cannot expect total privacy while alone in another person's hotel room (i.e., a maid might enter, someone might peek through a window, or the host might reenter unannounced), this diminished privacy interest does not eliminate society's expectation to be protected from the severe intrusion of having the government monitor private activities through hidden video cameras."); *Carter*, 770 F. Supp. 2d at 1050 ("[A]lthough

different dispatchers staffed the room and supervisors entered the room on occasion, the court concludes that the . . . Plaintiffs had an objectively reasonable expectation that they would not be surreptitiously videotaped."); *DeVittorio v. Hall*, 589 F. Supp. 2d 247, 257 (S.D.N.Y. 2008) ("[G]iven the fact that the room is used for private functions, such as changing clothes, plaintiffs do have a reasonable expectation of privacy from covert video surveillance while in the locker room."); *Avila v. Valentin-Maldonado*, No. 06-1285(RLA), 2008 WL 747076, at *13 (D.P.R. Mar. 19, 2008) ("[W]ith the evidence currently in record no reasonable jury could find that plaintiffs did not have a reasonable expectation of being free from covert video surveillance while in the locker-break room"); *Trujillo*, 428 F. Supp. 2d at 1104 ("Plaintiffs need not have an expectation of total privacy in order to have a reasonable expectation that they will not be recorded surreptitiously while changing clothes in a locker room.").   The complaint alleged sufficient facts to show that the plaintiffs had a reasonable expectation of privacy in Room 136 from covert video camera surveillance.

Relying on *United States v. Karo*, 468 U.S. 705 (1984), and *DeVittorio v. Hall*, 589 F. Supp. 2d 247 (S.D.N.Y. 2008), Rychlec and Walker also argue that the complaint fails to state a constitutional violation because the plaintiffs have not alleged that these defendants observed the video feed from the covert cameras.   According to these defendants, the plaintiffs' "only credible allegations state that Rychlec and Walker made a Constitutional violation possible—not that they caused one."   (Docket Entry No. 36, at 9).   Neither *Karo* nor *DeVittorio* supports the defendants' argument.   In *Karo*, the Supreme Court held that "[t]he mere transfer to Karo of a can containing an unmonitored beeper infringed no privacy interest" because an unmonitored beeper "convey[s] no information at all."   468 U.S. at 712.   The Court explained that the beeper "created a potential

for an invasion of privacy," which is not a Fourth Amendment search. *Id.* If it were, "a policeman walking down the street carrying a parabolic microphone capable of picking up conversations in nearby homes would be engaging in a search even if the microphone were not turned on. It is the exploitation of technological advances that implicates the Fourth Amendment, not their mere existence." *Id.* In *DeVittorio*, the court applied *Karo* in a § 1983 action in which police officers alleged that the defendants violated their Fourth Amendment rights by installing covert cameras in a locker room. The court held that no Fourth Amendment search occurred because "no video recordings were ever made." *DeVittorio*, 589 F. Supp. 2d at 257. "Surely the installation of the camera created the potential for an invasion of privacy, but as the camera did not work and recorded no images, other than two still pictures of the lockers, it conveyed no private information at all and, therefore, did not infringe on anyone's privacy interest." *Id.* (footnote omitted).

By contrast, Jones and Mason alleged that their reasonable expectation of privacy was in fact infringed. The plaintiffs alleged that the covert camera in Room 136 recorded them while they changed clothes and that other individuals saw the video feed. (Third Am. Compl. ¶¶ 25–27, 44). The plaintiffs did not need to allege that Rychlec and Walker saw the video feed to state a constitutional violation against them. A supervisor may be liable under § 1983 if he is personally involved in a constitutional deprivation or if there is "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987); *see also Henzel v. Gerstein*, 608 F.2d 654, 658 (5th Cir. 1979) ("Supervisory officials need not have participated personally in an act in order to be liable under § 1983 for the consequences of the act, but the plaintiff must show some causal connection between an act of the official and the alleged violation."). "The requisite causal connection is satisfied if the defendant

27

set in motion a series of events that the defendant knew or should have known would cause others to deprive the plaintiff of her constitutional rights." *Conner v. Reinhard*, 847 F.2d 384, 397 (7th Cir. 1988).  The plaintiffs alleged that the covert camera in Room 136 was installed at Rychlec's and Walker's direction; that Room 136 posed no security concerns that would have justified the installation of a covert video surveillance camera; that Room 136 was used in the normal course of business by officers to change clothes; and that by installing the covert camera, the defendants allowed an unknown number of individuals to monitor the plaintiffs while they were changing clothes.  The plaintiffs have pleaded a sufficient causal connection between Rychlec's and Walker's conduct and the alleged constitutional violation.  The defendants' motion to dismiss based on the plaintiffs' failure to plead a constitutional violation is denied.

### B.    Whether the Right to Be Free From Covert Video Surveillance in Room 136 Was Clearly Established

The plaintiffs have alleged that they have a Fourth Amendment right to be free from covert video surveillance in an office that is: (1) generally not open to the public; (2) dedicated to their use while they are on duty; and (3) routinely used by officers to change in and out of their uniforms. The plaintiffs have also alleged that the covert camera was installed in the office in late 2005 to monitor their private activities and that it was used until July 2008.  The issue is whether, during this period, a reasonable HCC official would have had fair notice that using a covert video surveillance camera secretly to monitor and record female security officers in an office where they changed clothes—an office routinely used as a part-time locker room—was unconstitutional.

When the covert camera was installed, it was clearly established that public employees have a reasonable expectation of privacy in an office against unexpected and nonroutine employer intrusions, that video surveillance of areas in which an individual has a reasonable expectation of

28

privacy is a Fourth Amendment search, and that video monitoring is a particularly intrusive surveillance technique.   In *O'Connor*, the Supreme Court acknowledged that reasonable expectations of privacy in an office may be diminished by the operational realities of the workplace. But the Court recognized that "constitutional protection against *unreasonable* searches does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer."   480 U.S. at 717(plurality opinion); *see also id.* at 731 (Scalia, J., concurring). Although a plurality of the Court indicated that "whether an employee has a reasonable expectation of privacy [in an office]   must be addressed on a case-by-case basis," *id.* at 718, *O'Connor* recognized that reasonable expectations of privacy against unexpected and nonroutine intrusions do not disappear unless an office is "so open to fellow employees or the public that no expectation of privacy is reasonable," *id.* at 718.   A majority of the Court concluded that a physician working in a state hospital had a reasonable expectation of privacy in an office that had been assigned to him and was not exposed to the public.   *See id.* (plurality opinion) ("The Court of Appeals concluded that Dr. Ortega had a reasonable expectation of privacy in his office, and five Members of this Court agree with that determination."); *id.* at 731 (Scalia, J., concurring) ("I would hold . . . that the offices of government employees . . . are covered by the Fourth Amendment protections as a general matter . . . .   Since it is unquestioned that the office here was assigned to Dr. Ortega, and since [the office is not exposed to the public], . . . I would agree . . . that Fourth Amendment protections applied."); *id.* at 740 (Blackmun, J., dissenting) ("Dr. Ortega clearly had an expectation of privacy in his office . . . particularly with respect to the type of investigatory search involved here.").

In *United States v. Cuevas-Sanchez*, 821 F.2d 248, 250–51 (5th Cir. 1987), the government placed a video camera on a power pole overlooking the defendant's ten-foot-high fence, allowing

the government to monitor all activity in the defendant's backyard.  The Fifth Circuit held that because the defendant had a reasonable expectation of privacy in his backyard, the video surveillance "qualif[ied] as a search."  *Id.* at 251.  The court's conclusion was based, in part, on the intrusiveness of video surveillance.  As the court explained, "[t]his type of surveillance provokes an immediate visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state."  *Id.*  By 2004, other courts had also recognized the particular intrusiveness of video surveillance.  *See, e.g., United States v. Falls*, 34 F.3d 674, 680 (8th Cir. 1994) ("It is clear that silent video surveillance results . . . in a very serious, some say Orwellian, invasion of privacy."); *United States v. Koyomejian*, 970 F.2d 536, 551 (9th Cir. 1992) (Kozinski, J., concurring) ("[E]very court considering the issue has noted [that] video surveillance can result in extraordinarily serious intrusions into personal privacy."); *Taketa*, 923 F.2d at 677 ("[T]he silent, unblinking lens of the camera was intrusive in a way that no temporary search of the office could have been."); *United States v. Mesa–Rincon*, 911 F.2d 1433, 1443 (10th Cir. 1990) ("Because of the invasive nature of video surveillance, the government's showing of necessity must be very high to justify its use."); *United States v. Torres*, 751 F.2d 875, 882 (7th Cir. 1984) (We think it . . . unarguable that television surveillance is exceedingly intrusive, especially in combination (as here) with audio surveillance, and inherently indiscriminate, and that it could be grossly abused—to eliminate personal privacy as understood in modern Western nations.").

The cases that had been decided when the events at issue in this case occurred make it clear that the defendants' alleged conduct violated rights clearly established at that time.  *O'Connor* establishes a reasonable expectation of privacy—at least against unexpected and nonroutine intrusions such as surreptitious video surveillance—in an office used by public employees,

depending on how the office was used.  Under *O'Connor* and other cases, the facts that the office was assigned to the plaintiffs to use while they were on duty, that it was not open to the public, and that it was used, in part, as a locker room, all supported a reasonable expectation of privacy in that office.  *Cuevas-Sanchez* and other cases establish that indiscriminate video surveillance is a search of a distinctively intrusive nature.  Although there were no Supreme Court or Fifth Circuit cases directly dealing with covert video surveillance by government employers of their employees' offices, the contours of the plaintiffs' Fourth Amendment right—in the particular circumstances of this case—was sufficiently clear to give the defendants fair warning that their conduct violated the law.

The defendants argue that "[t]he case law of courts outside the Fifth Circuit [was] unclear regarding whether there could be a reasonable expectation of privacy in the Security Office in this case" and ask this court to compare the Tenth Circuit's decision in *Thompson v. Johnson County Community College*, 1997 WL 139760 (10th Cir. 1997) (unpublished), with the Ninth Circuit's 1991 *Taketa* decision.  (Docket Entry No. 36, at 12.).  *Taketa* supports this court's conclusion and *Thompson* is distinguishable in light of the allegations in the complaint.

In *Taketa*, three DEA agents shared an airport office that consisted "of a large office with two smaller offices attached.  [One agent] used the larger general office, while Taketa and O'Brien each used one of the smaller private offices." 923 F.2d at 668.  When other DEA agents learned that Taketa and O'Brien might be using a pen register to intercept telephone conversations illegally, those agents searched O'Brien's office and installed a hidden video camera.  *Id.* at 668–69.  Taketa and O'Brien were convicted based both on the evidence uncovered by the other DEA agents in the physical search of O'Brien's office and on the video recordings.  *Id.* at 669.  Taketa and O'Brien

31

challenged the admissibility of the evidence under the Fourth Amendment.  Applying *O'Connor*, the court held that O'Brien had a reasonable expectation of privacy in his office, even though other employees had access to it.  *Id.* at 673.  The court held that Taketa had "a reasonable privacy expectation that he would not be videotaped by the government agents in O'Brien's office" and that the covert video surveillance of Taketa in his coworker's office violated the Fourth Amendment. *Id.* at 677.  Here, the plaintiffs alleged that they were secretly videotaped in an office that was assigned to them and routinely used to change clothes.  The privacy expectations against video surveillance in one's own office—particularly one used for such intimate activities as dressing and undressing—are greater than in another's office.  *Taketa* supports this court's conclusion that Rychlec and Walker had fair warning that their actions would violate the Fourth Amendment.

In *Thompson*, the Tenth Circuit held that security officers employed by a community college did not have a reasonable expectation of privacy in a locker area that was not locked and that many other employees could freely access.  The court explained:

> Plaintiffs' locker area was located in a room which also housed the heating and air conditioning equipment for the college and which served as a storage area.  Individuals other than plaintiffs, including security officers who worked during the day, maintenance workers, and individuals seeking to retrieve items in storage, could freely enter the room at any time.  The room was not locked and access was not even restricted to those with legitimate business in the room.

*Thompson*, 1997 WL 139760, at *1.  The plaintiffs' factual allegations, which this court must accept as true, distinguish this case from *Thompson*.  The plaintiffs have alleged that Room 136 was dedicated to their use while they were on duty, that access was restricted to other on-duty security officers, that the office was used in the normal course of their business to change clothes, and that it was locked whenever the officers changed clothes.  The unpublished *Thompson* decision would

not cause reasonable college officials to doubt whether the video surveillance alleged in this case was unconstitutional.

## VI.      Conclusion

For the reasons discussed above, and without prejudice to reurging similar arguments on summary judgment with an expanded record, the defendants' motions to dismiss are denied.  The plaintiffs' motion for leave to file the third amended complaint is granted.

SIGNED on September 30, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge