**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ALFREDA JONES, *et al*., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-2356 |
| | § | |
| HOUSTON COMMUNITY COLLEGE | § | |
| SYSTEM, *et al*., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

The plaintiffs, Alfreda Jones and Kimberly Mason, officers on the campus security force of

the Houston Community College ("HCC"), discovered a covert surveillance-video camera in the

office that they used for various purposes, including changing in and out of their uniforms.  Jones

and Mason sued HCC; its Director of Maintenance, Timothy Rychlec; and its Vice-Chancellor of

Finance and Administration, Gloria J. Walker.  Jones and Mason also sued three private contractors

they allege HCC retained to install this and other cameras on the campus: Kratos Defense and

Security Solutions, Inc.; Kratos Texas, Inc.; and Aramark Management Services Limited

Partnership.[1]  The complaint alleged that all defendants are liable under 42 U.S.C. § 1983 for

violating the Fourth and Fourteenth Amendment and that the private-contractor defendants are liable

under state law for invasion of privacy.

Both sets of defendants have moved for summary judgment on several grounds.  (Docket

Entries No. 63, 68, 70.)  The private contractors argue that they cannot be held liable under 42

U.S.C. § 1983 because there is no evidence that they acted under color of state law.  Kratos

---

[1] This opinion refers to the two Kratos defendants collectively as "Kratos."

additionally argues that it did not invade the plaintiffs' privacy because it never monitored the covert

surveillance camera in the security office.  Unlike Kratos, Aramark has not moved for summary

judgment on the state-law invasion of privacy claim.  HCC argues that it cannot be held liable under

42 U.S.C. § 1983 because there is no evidence that an official HCC policy or custom caused the

alleged constitutional violations.  Rychlec and Walker argue that no Fourth Amendment search

occurred because there is no evidence that anyone monitored the covert video-surveillance camera

in the security office.  They also argue that even assuming a search occurred, they are entitled to

qualified immunity because the right to be free from covert video surveillance in the campus security

office was not clearly established at the time of the alleged constitutional violations.  They point to

record evidence that the office was used by many people for general office purposes and was not

designated as, or known to be used as, a changing room.  Jones has responded to the summary

judgment motions, (Docket Entry No. 94), and the defendants have replied, (Docket Entries No. 90,

91, 92).

Based on the pleadings; the motions, response, and replies; the record; and the relevant law,

this court grants the motions for summary judgment.  The reasons are explained below.

I.      Background

HCC is a community college system with campuses in Houston and surrounding cities.  One

of the community colleges that HCC operates is the Coleman College for Health Sciences.  Located

in the Texas Medical Center, Coleman College confers associate degrees and certificates in

numerous health science fields.

In July 2005, HCC entered into a Facilities Management Services Agreement with Aramark.

Under that agreement, Aramark was to provide facilities management services for several HCC

facilities, including Coleman College.  (Docket Entry No. 63-1, at 2.)  The agreement stated that

Aramark "will perform its services . . . as an independent contractor, and nothing in this Agreement

shall be deemed to make ARAMARK, or its employees, a common law employee, agent, partner

or fiduciary of, or joint venturer with" HCC.  (*Id.*)  In September 2005, Aramark entered into a

Service Provider Agreement with Kratos, then known as Enco Systems, Inc., under which Kratos

agreed to perform maintenance on the HVAC and security systems at HCC campuses.   The

agreement stated that Kratos "will perform its obligations . . . as an independent contractor and not

as the agent or employee of" Aramark or HCC.  (Docket Entry No. 63-4, at 2–3.)

Alfreda Jones and Kimberly Mason were part of HCC's security force.  Jones began working

at Coleman College in 1999 as a security officer.  (Jones Dep. 17:19–20, 21:15–17.)  Mason became

a part-time police officer at Coleman College in spring 2008.  (Mason Dep. 21:21–22:20.)  It is

unclear whether Jones and Mason still work for HCC, either at Coleman College or at another

campus.

Jones and Mason were among the HCC personnel using Room 136, the Security and Campus

Police Office at Coleman College (the "Security Office" or "Office").  The Security Office is a small

room, approximately ten feet by ten feet.  (Jones Dep. 130:21–24; Head Dep. 94:22–24.)  It contains

a desk and a table joined together in an "L" shape in the center of the room.  A computer monitor

from which the security officers can monitor the campus's security cameras sits on the table.  The

Security Office has a "Dutch" door, which means that the bottom half of the door can be shut while

the top half of the door remains open, or the entire door can be open or shut.  (Jones Dep. 36:17–24.)

The Security Office contains a locked drawer in the desk, but does not contain lockers.  (*Id.*

80:16–81:3.)  The Office has an instrument panel that allows the fire department, in the event of a

fire, to control the fire alarm and sprinkler system throughout the building from one central location. The panel must be readily accessible to fire department personnel at all times.  (Mason Dep. 25:4–13.)

Security and police personnel, campus maintenance personnel, and fire department personnel all had access to the Office while Jones and Mason worked at Coleman College.  (Jones Dep. 34:6–18; Rychlec Dep. 159:17–161:25.)  Jones and Mason, as well as other security officers, stored their lunches in the Office.  (Jones Dep. 59:5–9.)  The Office also contained a microwave that was used by security and police personnel, an HCC shipping tech, and Aramark maintenance personnel. (Jones Dep. 34:2–18, 156:4–12; Mason Dep. 25:17–26:7.)

All visitors to the Coleman College campus, all HCC vendors, and HCC personnel working in the building on weekends were required to stop by the Security Office to sign in before conducting their on-campus tasks.  (Jones Dep. 34:19–24; Mason Dep. 26:8–24.)  People could come by the Security Office at any time to discuss campus security issues.  (Mason Dep. 87:3–13.)

Jones and Mason occasionally used the Security Office to change in and out of their uniforms.  It is undisputed that neither the defendants nor other HCC management personnel knew that Jones and Mason used the Security Office as a changing room.  (Jones Dep. 57:3–23; Mason Dep. 35:7–37:2; Rychlec Dep. 212:14–213:3.)  The Office was located 25 feet from a bathroom where Jones and Mason could have changed clothes.  (Jones Dep. 50:2–10.)

In November 2005, Rychlec, HCC's Director of Maintenance, discovered that books were being stolen from the Coleman College library.  He suspected Aramark maintenance personnel of the theft. (Rychlec Dep. 315:10–23.)  HCC Police Lieutenant Renk asked Rychlec to help the police department in the theft investigation.  During the investigation, Renk decided that covert cameras

needed to be installed on the Coleman College campus and identified locations for their installation. (Rychlec Aff. ¶ 4.)  One of the locations was inside the light fixture in the Security Office, which Aramark maintenance personnel had access to.  Rychlec did not decide where the covert cameras should be installed.  (Rychlec Dep. 223:4–14, 227:6–8, 228:23–24, 230:4–5.)

On HCC's behalf, Rychlec contracted with Kratos for the purchase and installation of the covert security cameras Renk requested.  On November 21, Rychlec received a proposal from Kratos for the purchase and installation of four covert cameras, including three "smoke detector cameras and one wireless wall clock camera."  (Docket Entry No. 63-5, at 2.)  The proposal stated the cameras would be installed after 10 p.m.  (*Id.*)  HCC submitted a purchase order consistent with the Kratos proposal on November 29.  (*Id.* at 6.)  The purchase order contained the following instructions for Kratos: "Supply and install cameras at various HCC[] locations as determined by Tim Rychlec."  (*Id.*)  Rychlec "arranged for Karen Head, a representative of Kratos, to have the cameras installed, and showed her around the Coleman campus pointing out the locations where Renk had decided the cameras should go."  (Rychlec Aff. ¶ 4.)  Kratos installed the covert cameras, including the one in the Security Office, sometimes in November 2005.

Aramark was not involved in installing or monitoring the cameras.  (Rychlec Dep. 314:13–315:9.) Because Rychlec suspected that Aramark maintenance personnel were involved in the library theft, he did not tell Aramark about the decision to install the covert cameras or their subsequent installation.  (*Id.* 93:24–94:11, 303:11–23, 314:13–16.)  As Rychlec explained, telling Aramark about the covert cameras would "defeat the purpose" of catching the suspected Aramark personnel.  (*Id.* 315:24–316:14.)

Rychlec never monitored the video recordings from the covert camera in the Security Office

and has no knowledge of anyone having done so.  (Rychlec Aff. ¶ 5; Rychlec Dep. 213:9–24.)

There is no evidence that Kratos employees monitored recordings from the covert camera in the

Security Office.

In December 2005, Rychlec informed his supervisor, Gloria Walker, "that he had assisted

Lieutenant Renk in investigating the thefts, and that hidden cameras had been placed on the

Coleman campus to aid the investigation." (Walker Aff. ¶ 4.)  At that time, Walker was HCC's

Chief Financial Officer and Vice-Chancellor of Finance and Administration.  (*Id.* ¶ 2.)  Like

Rychlec, Walker "was not involved with the decision to purchase or place [hidden] camera systems

at Coleman or anywhere else." (*Id.* ¶ 5.)  Walker has not "watched or reviewed any recordings from

any hidden cameras from any HCC campus" and has no "personal knowledge of anyone else having

done so." (*Id.*)  Walker never knew that "anyone used the Security Office . . . as a changing room."

(*Id.* ¶ 6.)  The first time she learned that Jones and Mason used the Security Office to change in and

out of their uniforms "was when the Plaintiffs brought their present lawsuit." (*Id.*)

In August 2008, Jones and Mason learned about the covert camera that had been installed

in the Security Office.  Jones and Mason sued Aramark, Kratos, HCC, Rychlec and Walker,

asserting causes of action for Fourth and Fourteenth Amendment violations under 42 U.S.C. § 1983

and for invasion of privacy under Texas law.  Mason has settled or otherwise resolved her claims

against the defendants.  The defendants have moved for summary judgment on Jones's claims, and

Jones has responded to the motions.  The parties' arguments for and against summary judgment are

discussed below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d

at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

### III.    The Private Contractors' Summary Judgment Motions

To prevail on a claim under 42 U.S.C. § 1983, "a plaintiff must first show a violation of the Constitution or of federal law, and then show that the violation was committed by someone acting under color of state law."  *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008).  "In general, private entities are not liable to suit under § 1983."  *Hebrew v. Houston Media Source*, 453 F. A'ppx 479, 481 (5th Cir. 2011).  To survive Aramark's and Kratos's motions to dismiss, Jones "must present evidence that [Aramark and Kratos were] acting under color of state law, such that [their] conduct was fairly attributable to the State."  *Id.* (internal quotation marks and citations omitted).

"The Supreme Court has utilized a number of tests for deciding whether a private actor's conduct can be fairly attributable to the State."  *Cornish v. Correctional Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005).  Under the "joint action test," the test most relevant to this case, "private actors will be considered state actors where they are willful participants in joint action with the State or its agents."  *Id.* (alteration, citation, and internal quotation marks omitted).  "[O]ne way to prove willful joint action is to demonstrate that the public and private actors engaged in a conspiracy."  *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1126 (10th Cir. 2000); *see also Keko v. Hingle*, 318 F.3d 639, 642 (5th Cir. 2003) ("As the Supreme Court has held, a private party may be liable for

8

conspiring with state actors to violate civil rights."). To prove willful joint action under a conspiracy theory, the plaintiff must show "(1) an agreement between the private and public defendants to commit an illegal act and (2) a deprivation of constitutional rights." *Priester v. Lowndes Cnty.*, 354 F.3d 414, 420 (5th Cir. 2004). In other words, the plaintiff must show that the "public and private actors share[d] a common, unconstitutional goal." *Sigmon*, 234 F.3d at 1126.

Aramark argues that it is entitled to summary judgment on Jones's § 1983 claim because Jones cannot show that Aramark acted under color of state law or that Aramark violated her constitutional rights. (Docket Entry No. 63, at 2–3.) Aramark submitted evidence showing that it contracted with HCC as an independent contractor to provide facilities management services at several campuses, including Coleman College. Aramark also submitted evidence showing that it did not know about HCC's decision to install a hidden surveillance camera in the Security Office and that it had no involvement in the installation and monitoring of that camera. The burden shifts to Jones, who "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). Jones has failed to meet her burden.

Though Jones asserts that "the extent of Aramark's involvement . . . in maintaining the entire covert . . . surveillance system . . . is a fact question for the jury," (Docket Entry No. 94, at 19), Jones has neither identified nor submitted evidence showing that Aramark knew about or was connected to the hidden surveillance camera in the Security Office or that Aramark conspired with HCC to deprive Jones of her constitutional rights. The undisputed evidence is that Aramark had no knowledge of the installation or use of the camera in the Security Office. Jones relies on "conclusory allegations, speculation, and unsubstantiated assertions," but these "are inadequate to

satisfy the nonmovant's burden in a motion for summary judgment." *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (citation and internal quotation marks omitted). Aramark's motion for summary judgment is granted.

Like Aramark, Kratos moves for summary judgment on the § 1983 claim in part based on the lack of evidence showing that Kratos acted under color of state law. Kratos points to evidence showing that it installed the covert camera in the Security Office as a private contractor fulfilling a customer request. Kratos also points to evidence showing that though it installed and later removed that camera, it did not monitor any footage the camera may have recorded. Jones responds that "Kratos did much more than simply install 'a camera.' . . . Kratos and its predecessor companies installed numerous surveillance and covert cameras, participated in the cover up of the installation[] and removal, and was the expert in the industry on covert cameras sold to HCC . . . ." (Docket Entry No. 94, at 12–13.)

Contrary to Jones's argument, there is no evidence that Kratos conspired with HCC, Walker, or Rychlec to deprive Jones of her constitutional rights. The record reveals that Kratos installed the hidden camera in the Security Office, but did not monitor it. Though HCC purchased the hidden camera from Kratos and though Kratos installed it, the evidence shows that Kratos's only role was as a private contractor taking direction from the state actor with which it had a commercial, business relationship. Evidence that Kratos installed or removed the camera after regular business hours, in part to avoid detection, is not evidence of a conspiracy between Kratos and HCC. The record reveals that Kratos employees were following Rychlec's instructions, and that Rychelc wanted to limit the number of people who knew about the hidden camera to ensure a more effective theft investigation. Jones has not identified any evidence showing that Kratos suggested that the hidden

camera in the Security Office be installed after hours or that the hidden camera be installed surreptitiously. Stated differently, Jones has not identified any evidence that Kratos acted other than as a private contractor following its customer's directions or that Kratos and HCC shared a common, unconstitutional goal.

"It is well settled that a state contractor and its employees do not become state actors simply because they are carrying out a state-sponsored program or are being compensated by the State." *Hamlin v. City of Peekskill Bd. of Educ.*, 377 F. Supp. 2d 379, 384 (S.D.N.Y. 2005); *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) ("Acts of . . . private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts."). "The mere fact that [a private party] contracted with the federal government, without more, does not establish that [the private party] was acting under color of state law." *Boatwright v. OMI, Inc.*, No. 5:05-cv-266 (CAR), 2006 WL 2523110, at *4 (M.D. Ga. Aug. 29, 2006). Providing security surveillance maintenance services on a college campus is not and never has been the *exclusive* prerogative of the State. The mere fact that Kratos provided those services for HCC does not convert Kratos's conduct into state action. Kratos's summary judgment motion on the § 1983 claim is granted.

Kratos also moves for summary judgment on the state-law invasion of privacy claim. To prevail on an intrusion-upon-seclusion claim, a party must show "an intentional intrusion, physical or otherwise, upon his solitude, seclusion, or private affairs or concerns" that "would be highly offensive to a reasonable person." *Robinson v. Brannon*, 313 S.W.3d 860, 867 (Tex. App.—Houston [14th Dist.] 2010, no pet.) The cause of action is "typically associated with either a physical invasion of a person's property or eavesdropping on another's conversation with the aid

of wiretaps, microphones, or spying." *Clayton v. Wisener*, 190 S.W.3d 685, 696 (Tex.App.—Tyler 2005, no pet.).

The record evidence reveals that Kratos installed and later removed the hidden camera in the Security Office at HCC's request, but did not monitor the camera.  There is no evidence that Kratos knew that Jones or other campus security officers used the Security Office to change clothes or that it conspired with HCC to intrude upon Jones's seclusion.  Texas law does not provide a basis for holding Kratos liable for invasion of privacy based solely on evidence that it installed surveillance equipment in response to a customer request.

Kratos's motion for summary judgment on the invasion of privacy claim is granted.[2]

## IV.   HCC's Summary Judgment Motion

To prevail on a § 1983 claim against HCC, Jones must show that an official policy or custom of which a policymaker can be charged with actual or constructive knowledge caused a deprivation of her constitutional rights.  *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002). "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.  In particular, . . . a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."[3]  *Monnell v. Dep't of Social Servs.*, 436 U.S. 658,

---

[2]  Though Aramark did not move for summary judgment on the state-law invasion of privacy claim Jones asserted against it, the evidence that Aramark intruded upon Jones's seclusion is much weaker than the evidence that Kratos did so.  Unlike Kratos, who installed and later removed the  Security Office camera, Aramark did not know about the camera.  No later than August 13, 2012, Jones must present what additional evidence she has, if any, that Aramark intentionally intruded upon her seclusion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (stating that "district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence"); Fed. R. Civ. P. 56(f)(2) ("After giving notice and a reasonable time to response, the court may . . . grant [summary judgment] on grounds not raised by a party.").

[3]  Although *Monell* refers to municipalities, *Monell* applies generally to suits against local government entities, including public colleges.  *See Goss v. San Jacinto Junior College*, 588 F.2d 96, 98 (5th Cir. 1979).

691 (1978).  The "official policy" requirement distinguishes "acts of the *municipality* from acts of *employees* of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

A plaintiff may show an official policy or custom in several ways.  First, a municipality "may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy." *Id.* at 480.  Second, action by an official with "final authority to establish municipal policy with respect to the action ordered" also constitutes official policy.  *Id.* at 481; *see also McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 784 (1997) ("[Official] policies may be set by the government's lawmakers, 'or by those whose edicts or acts may fairly be said to represent official policy.'" (quoting *Monell*, 436 U.S. at 694)); *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008) ("It is well-established that a single unconstitutional action by a municipal actor may give rise to municipal liability if that actor is a final policymaker.").  And third, the plaintiff can show the existence of an official custom by pointing to a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984) (en banc).

HCC argues that it is entitled to summary judgment on Jones's § 1983 claim because there is no evidence of an official HCC policy or custom that caused the alleged constitutional violation. Jones responds that there are disputed fact issues material to determining whether Rychlec and

Walker were final HCC policymakers with respect to the installation and placement of covert

surveillance cameras on campus and whether there was a persistent and widespread practice at HCC

of conducting covert video surveillance of HCC employees in areas in which they had a reasonable

expectation of privacy.

Whether an official had final policymaking authority is a question of state law "to be

resolved by the trial judge *before* the case is submitted to the jury." *Jett v. Dallas Indep. Sch. Dist.*,

491 U.S. 701, 737 (1989).  As the Supreme Court has explained, "[t]he fact that a particular

official—even a policymaking official—has discretion in the exercise of particular functions does

not, without more, give rise to municipal liability based on an exercise of that discretion.  The

official must also be responsible for establishing final government policy respecting such activity

before the municipality can be held liable." *Pembaur*, 475 U.S. 481–83 (internal citation omitted).

Local governments "often spread policymaking authority among various officers and official

bodies," which means that "particular officers may have authority to establish binding . . . policy

respecting particular matters." *Id.* at 483.  Liability attaches "where—and only where—a deliberate

choice to follow a course of action is made from among various alternatives by the official . . .

responsible for establishing final policy *with respect to the subject matter in question.*"  *Id.*

(emphasis added).

Contrary to Jones's argument, the record does not reveal a disputed fact issue material to

determining whether Rychlec and Walker were final policymakers with respect to the installation

and placement of covert surveillance cameras at Coleman College.  HCC contends that under state

law, its Board of Trustees, not Rychlec or Walker, was the final policymaker for security decisions

affecting the Coleman campus.  HCC is a Junior College District organized under Chapter 130 of

the Texas Education Code.  Under Texas law, a Junior College District like HCC is governed by a

Board of Trustees.  *See* TEX. EDUC. CODE § 130.082(b).  The Board has the power "to appoint or

employ such agents, employees, and officials as deemed necessary or advisable to carry out any

power, duty, or function;" "shall act and proceed by and through resolutions or orders adopted or

passed by the board;" and "shall adopt such rules, regulations, and bylaws as it deems available."

*Id.* § 130.082(d).  The HCC Board's bylaws state that the Board "has final authority to determine

and interpret the policies that govern the [Houston Community College] System, and within the

limits imposed by other legal authorities, has complete and full control of the College System."

(Docket Entry No. 68-10, at 16.)  The Bylaws also state that the Board "has the authority . . . [t]o

order police protection for the System."  (*Id.* at 16–17.)

Jones addresses HCC's argument in two sentences.  First, Jones argues that Rychlec was a

final policymaker because he testified that "if the total price was over $25,000.00, the purchase

would have to be forwarded up the chain to be approved" by the Board of Trustees.  (Docket Entry

No. 94, at 14.)  But Jones does not explain how the fact that the Board has to approve certain

purchases makes Rychlec the final policymaker for security decisions at Coleman College.  Even

if Jones developed her argument to provide that explanation, the argument would still fail because

Jones cites only to portions of Rychlec's deposition that neither she nor the defendants have made

part of the record.[4]  Second, Jones states that "[a]t all times pertinent to this action, [Rychlec and

Walker] were final policy makers for formulating and instituting security policy for HCC."  (*Id.*).

---

[4] In the background section of her summary judgment response, Jones states that under HCC's "bylaws and/or regulations, [Rychlec and Walker] had the authority by virtue of their official positions to make purchases in the dollar amounts represented by the covert cameras."  (Docket Entry No. 94, at 7.)  Jones's response neither provides a record citation to support this assertion nor explains how the authority to make purchases for a certain dollar amount translates into final decision-making authority for security issues on campus.

To support this assertion, Jones again cites to portions of Rychlec's deposition that are not part of the record. Jones's unsubstantiated, conclusory statement that Rychlec and Walker were final policymakers for security issues at Coleman College cannot defeat HCC's properly supported motion for summary judgment. *See RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

Citing to Rychlec's deposition, Jones argues that HCC may be held liable under § 1983 because it had a persistent, widespread custom of unconstitutionally monitoring its employees through covert video surveillance. (Docket Entry No. 94, at 16.) Rychlec's testimony does not support Jones's argument. Rychlec testified that at the time HCC contracted with Aramark in 2005, HCC's police department was using four sets of covert cameras that "were moved around as the detective branch asked [them] to be moved." (Rychlec Dep. 73:22–23.) Jones does not point to any evidence showing where those covert cameras were installed or how and when they were used. Rychlec also testified that he first learned that covert video surveillance was used on campus in 2001, when he found a hidden camera "in an elevator behind the elevator light." (*Id.* 82:17–18.) Although Jones has produced evidence that HCC used covert cameras at Coleman College and other campuses, the evidence does not establish that HCC had a history of unconstitutionally monitoring its employees through covert video surveillance. With the exception of the hidden camera in the elevator, Jones does not point to any evidence showing where or how frequently the covert cameras were used. Without such evidence, Jones cannot raise a fact issue as to whether HCC had a persistent and widespread policy of monitoring employees in areas where they had a reasonable expectation of privacy.[5] As a matter of law, the record evidence does not support an inference or

---

[5] In the background section of her summary judgment response, Jones states that she learned that HCC installed covert cameras "over the dean's office or in the antechamber to the dean's office, near or over the restroom area of the lab, in the Student Services office, immediately outside the Security Office, in the lobby of the building, and in the library." (Docket Entry No. 94, at 5.) Jones provides no record citation to support this allegation. Nor does she explain

give rise to a factual dispute material to determining that an official policy or custom of HCC caused

Jones's alleged constitutional violation.  HCC's summary judgment motion is granted.

## V.      The Individual HCC Defendants' Summary Judgment Motions

"Qualified immunity shields federal and state officials from money damages unless a

plaintiff [shows] (1) that the official violated a statutory or constitutional right, and (2) that the right

was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct.

2074, 2080 (2011).  A right is "clearly established" if, at the time of the alleged violation, its

"contours [are] sufficiently clear that a reasonable official would understand that what he is doing

violates that right.  This is not to say that an official action is protected by qualified immunity unless

the very action in question has previously been held unlawful, but it is to say that in the light of

pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640

(1987) (internal citation omitted).  Because qualified immunity protects "all but the plainly

incompetent or those who knowingly violate the law," courts "do not deny immunity unless existing

precedent must have placed the statutory or constitutional question *beyond debate*." *Morgan v.*

*Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (citations and internal quotation marks

omitted).

When holding that conduct violated clearly established law, a court "must be able to point

to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours

of the right in question with a high degree of particularity." *Id.* at 371–72 (quoting *al-Kidd*, 131 S.

Ct. at 2084). "Although the Supreme Court has repeatedly admonished courts not to define clearly

established law at a high level of generality, this does not mean that 'a case directly on point' is

---

why areas such as an antechamber to the dean's office, outside a restroom, or in the building lobby were constitutionally suspect places for covert security monitoring.

required." *Id.* at 372 (quoting *al-Kidd*, 131 S. Ct. at 2083).  The Court has explained that an official "can still be on notice that [his] conduct violates established law even in novel factual circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  "[T]he salient question . . . is whether the state of the law [at the time of the alleged violation] gave [that official] fair warning that [his conduct] was unconstitutional."  *Id.*; *see also Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S. Ct. 2633, 2643 (2009).

Rychlec and Walker argue that they are entitled to qualified immunity because they did not violate Jones's Fourth Amendment rights and because the right to be free from covert video surveillance in the Security Office was not clearly established at the time the hidden camera was installed there.  Courts "have discretion to decide which prong of the qualified immunity analysis to address first."  *Waganfeald v. Gusman*, 674 F.3d 475, 484 (5th Cir. 2012).

This court previously denied the defendants' motion to dismiss based on qualified immunity. There were allegations in the complaint that access to the Security Office was limited to campus security officers, that some security officers used the office as a changing room, and that the defendants installed the secret camera to observe those officers changing clothes.  The court relied in part on cases finding that employees may have a reasonable expectation of privacy in locker rooms and business offices designated for use only by specific individuals.  *See, e.g., United States v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991) (holding that a DEA agent had a reasonable expectation of privacy in his business office because that office "was not open to the public, and was not subjected to regular visits of inspection by DEA personnel"); *Trujillo v. City of Ontario*, 428 F. Supp. 2d 1094, 1107 (C.D. Cal. 2006) (holding that police officers had a reasonable expectation of privacy from covert video surveillance in a locker room).

18

On summary judgment, the legal standard and record are both different than they were at the motion to dismiss stage.  After discovery, the undisputed summary judgment evidence reveals that access to the Security Office was not limited as Jones alleged.  The record evidence reveals that campus security and police officers, maintenance personnel, and fire department personnel all had access to the Security Office.  Security and police officers, an HCC shipping tech, and Aramark maintenance personnel used a microwave in the Security Office.  All Coleman College visitors and vendors and all HCC personnel working at Coleman College on weekends were required to stop by the Security Office to sign in before conducting their on-campus tasks.  People could come by the security office at any time to discuss campus security issues.  The undisputed record evidence also reveals that the Security Office was not designated as a changing room.  No one except for the security and police officers who occasionally changed clothes there knew that some officers used the Office to change in and out of their uniforms.  The undisputed evidence is that Rychlec, Walker, and other HCC management personnel had no knowledge that the Office was used on occasion to change in and out of uniforms.

Based on the current record, the court cannot conclude that, at the time of the alleged constitutional violation, either controlling authority or a robust consensus of persuasive authority defined a right to be free from covert video surveillance in the Security Office, given its characteristics and uses, with the high degree of particularity required to find a clearly established right.  Cases like *Taketa* or *Trujillo*, on which Jones relies to show that Rychlec and Walker are not entitled to qualified immunity, involved either officially designated locker rooms or business offices with much more restricted access than the Security Office.  To deny qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question

about), the conclusion for every like-situated, reasonable government agent that what [the] defendant is doing violates federal law *in the circumstances*." *Sama v. Hannigan*, 669 F.3d 585, 591 (5th Cir. 2012) (citation omitted).  Given the undisputed evidence as to the circumstances and the case law identified in Jones's response to the motion for summary judgment, Jones has not made any showing that Rychlec's and Walker's allegedly wrongful conduct violated clearly established law.  *See Cantrell v. City of Murphy*, 666 F.3d 911, 918 (5th Cir. 2012) ("When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense.").  The HCC officials' motion for summary judgment based on qualified immunity is granted.

## VI.    Conclusion

The defendants' motions for summary judgment are granted.  All claims except the state-law invasion of privacy claim against Aramark are dismissed, with prejudice.  No later than **August 13, 2012**, Jones must inform the court what additional evidence, if any, she has that Aramark intruded upon her seclusion that would preclude summary judgment as to that claim.

SIGNED on August 2, 2012, at Houston, Texas.

Lee H. Rosenthal
United States District Judge